New York State Electric & Gas Corporation, Plaintiff, *v.* City of Plattsburg and Others, Defendants.

Supreme Court, Clinton County, August 15, 1938.

*Pierce & Holcombe [Wallace E. Pierce, Patrick J. Tierney, C. Edward Paxson* and *Jesse J. Holland* of counsel], for the plaintiff.

*Harry P. Kehoe, Corporation Counsel,* for the defendants.

LAWRENCE, J.   This is a taxpayer's action in equity to restrain the city of Plattsburg and its officials from proceeding with the construction of a municipal electric light and power plant under a grant and loan from the Federal government.

An injunction *pendente lite* was granted and, on appeal, was affirmed, with a statement by the appellate court that the issues should be determined without delay, as they were serious and involved the constitutionality of statutes.   At the next Trial Term in Clinton county the presiding justice, because of his relationship to one of the parties, felt that he should not determine the issues, and by stipulation of the attorneys the case was heard by the undersigned.

At the opening of the trial defendants made a motion to dismiss the complaint on the ground that it did not state facts sufficient to constitute a cause of action.   The sufficiency of the complaint was before the court on an application for temporary injunction. It was before the Appellate Division on appeal from the order granting the temporary injunction.   (254 App. Div. 628.)   The case was sent back for trial upon the complaint and the answer to be interposed.   The motion was and is denied.

Various other objections were and are made to the complaint. It is urged that there is a defect of parties defendant. It is stated that the action of the city in employing engineers to determine the cost of the project, and the payment to them by the city for services, make them necessary parties to the action because the complaint alleges that their actions were without authority and that under such circumstances an action would lie against them to recover the sums paid to them. It seems to me that such allegation should be deemed to state steps in the prosecution of a plan, which, in its entirety, is claimed to be a violation of the constitutional debt limit. Under those circumstances I cannot see how the engineers are necessary parties here.

Another objection urged by the defendants is that the Federal Administrator of Public Works should be brought into the action because, under the National Industrial Recovery Act, he had authority to accept and act upon an application for Federal aid and that, having acted on the program for proposed construction, his rights were prejudiced by the action to restrain its continuance, and that he should be heard. Primarily this action is to restrain the defendants from entering upon a plan of construction the expense of which will exceed the constitutional debt limit, and I fail to see how the presence in this action of the Federal Administrator is necessary or important. Moreover, the statute provides who are necessary parties.

Another objection by the defendants is that section 51 of the General Municipal Law does not apply here as its operation is suspended by reason of the enactment of the so-called Mandelbaum Act (Laws of 1933, chap. 782). That act states, in substance, that where it is inconsistent with other acts it shall control. It does not seem to me that it was thereby intended to deprive an interested party from establishing a violation of the Constitution. Such an intention and the granting of such power to municipal authorities would make it possible for cities to disregard the prohibition against incurring obligations beyond the constitutional limit. It would also remove the limitation placed on cities by section 20 of the General City Law. Defendants claim that no right to restrain cities existed under the common law and that, as the Mandelbaum Act suspends section 51 of the General Municipal Law, no present right exists to restrain cities from incurring unlimited indebtedness. With this I cannot agree.

Another objection by the defendants is that the plaintiff seeks to have the court vitiate and set aside the discretionary acts of city officials in deciding the amount which may be expended for the proposed system and, in effect, asks the court to substitute its

judgment for the judgment of the city officials. Courts do not concern themselves with acts which are administrative and discretionary. Whether a municipality shall engage in vast expenditures and establish various municipal activities which may destroy existing enterprises and deprive itself of tax revenue may be for them to decide. The question of the wisdom of a proposed construction is not for the court, but whether, under the law as limited by the Constitution, they have the power to carry out a proposed plan does become the concern of the court.

The question may not be raised that the city, under existing law, has no power to build an electric lighting and power plant and system, and if its acts are kept within constitutional limitations, no one can question its decisions. Here it is claimed that the constitutional limit has been exceeded and, taking the evidence as most favorable to the defendants, they have exceeded the constitutional debt limit by upwards of $14,000, and this is substantially conceded. The present assessed valuation of the city is $5,419,572. The existing debt limitation of ten per cent is, therefore, $541,957.20. The outstanding bonds, exclusive of the sewer bonds, are $299,000. Provision is made in the present budget for retiring $29,000. This leaves outstanding bonds of $270,000. Under the minimum estimate of cost of the construction of the proposed system, it will be necessary to issue additional bonds in the sum of $286,000. Subtract the margin of $271,957.20 and we have $14,042.80 as the amount over and above the limit allowed by the Constitution, taking the testimony in the most favorable construction possible for the defendants. The answer of the defendants regarding this situation is that it is not expected that the whole amount of bonds authorized will be issued, but that they will only be issued as funds are needed for carrying forward the plan, and that in the meantime further bonds will be paid so that the bonded limit will at no time be exceeded. It seems to me that we are dealing with present conditions and must determine the question of legality upon the present conditions. Under the circumstances here the least defendants would spend on the proposed construction is more than allowed by the Constitution.

Plaintiff claims, however, that a larger bond issue was authorized ($360,000 instead of $286,000) and that the cost of construction would far exceed the minimum estimate. Plaintiff's contention is that the cost of construction would be $687,540. Plaintiff submits evidence to that effect, which was received over objection. This cost would necessitate the issuance of bonds in excess of the debt limit by about $145,000, not taking into account the minimum amount of the sewer revenue bonds of $187,000, which plaintiff

claims should also be considered in determining the constitutional debt limit. Under those circumstances, in my judgment, that would spell out a waste of funds, and it almost becomes a matter of common knowledge and experience that the cost of construction would far exceed the minimum estimate. It seems to me that it is conclusively established that, until arrangements are made so that defendants can proceed with construction within the debt limit by raising assessments or lowering the cost of construction, they should be restrained from entering upon a plan or scheme which would amount to a violation of fundamental law. Their plan is definite and they contemplate going forward with it according to plans adopted.

Apparently, prior to August 23, 1935, there was discussion relative to the construction and equipment of a municipal electric light and power plant and system by persons interested. On that date there was a meeting of the common council of the city of Plattsburg at which the project was generally discussed and various resolutions were passed. In brief, for our purposes here these resolutions authorize the employment of Burns & McDonnell to make an investigation and survey of the cost of such construction and equipment, and, with the mayor, to make and file an application, on behalf of the city to the Federal government for a loan and grant to aid in financing the municipal system, and to furnish the Federal Emergency Administrator of Public Works with such information as he might request in connection with the application. On August 24, 1935, a contract was made with the firm of Burns & McDonnell to make a study and report of such cost at a stipulated price. Thereafter, under date of September 4, 1935, a proposal of the city to the Federal Administrator of Public Works was made. It recited that the estimated cost of the project was $520,000. It contained detailed specifications as to the cost of the work, the material, the equipment, etc., to be furnished. It stated, among other things, that the then debt limit was $175,000 and that on and after January 1, 1936, the contractual debt margin would be increased to $800,000 as the present assessments were on the basis of thirty-three and one-third per cent. This promise has not been fulfilled. Thereafter, and under date of February 29, 1936, the government, through the Federal Emergency Administrator of Public Works, made an offer to aid in financing the construction of an electric power plant and distributing system by making a loan and grant to the city in an amount not exceeding $520,000. The grant was to be in the sum of $234,000, representing forty-five per cent of the above sum, and the loan was to be in bonds of the city in the amount of $286,000, which the government agreed to take as

otherwise sold. These bonds were to bear interest at four per cent, payable semi-annually, and were to be dated November 1, 1935. The loan was to be secured by taxes to be levied on all the taxable property within the city. The government was to be under no obligation to take the bonds or make the grant if the financial condition of the city should change unfavorably in a material degree from its condition as represented to the government. The government was not to be under any obligation if it should appear that the city would not be able to complete the project for the sum allotted by the government. The offer, if accepted, was to supersede a prior offer of November 6, 1935. Upon acceptance of the offer the city was entitled to make a request for an advance of fifteen per cent of the estimated cost of the project to defray the expenses for preliminary investigations, etc. The request was to be accompanied by a certificate showing the purposes for which the advance grant would be used. This offer came before the common council at a regular meeting held March 6, 1936, and was accepted. Thereafter the defendant city passed a local law (Local Law No. 1, Local Laws of 1936, p. 230) authorizing the construction and completion of the project. Construction was to be in accordance with plans and specifications which had been approved by the common council at a maximum cost of $594,000 and an estimated cost of $520,000. It recited the Federal grant of $234,000 and authorized the issuance of bonds in the sum of $360,000, to be paid by taxation. This local statute became law May 15, 1936, upon approval at a special election held on that date. At a meeting of the common council, held July 11, 1936, the corporation counsel was directed to prepare such forms as might be essential for the sale of the bonds which had been authorized on May 15, 1936, in the sum of $360,000. The first sale, however, was not to exceed the then present contractual margin. At a meeting of the common council of the defendant city, held January 26, 1938, the city clerk was directed to prepare the necessary forms for the purpose of securing an advance of fifteen per cent of the estimated cost of construction.

It is apparent that defendants embarked upon a plan the maximum cost of which exceeds the constitutional debt limit and the ultimate cost of which may greatly exceed that limit, to say nothing of the bonds to be issued for the construction and enlargement of the present sewer system. Such expenditure and the incurring of such obligation are forbidden by the Constitution. Such expenditure is forbidden by subdivision 5 of section 20 of the General City Law. It is also forbidden by the city charter.

The above discussion has been made independent of the matter of sewer bonds claimed to be involved here. While it might seem that under the above views it becomes unnecessary to determine

whether they are involved, yet the able and exhaustive briefs submitted call for an expression by the court regarding their inclusion in arriving at the constitutional debt limit.

One phase of the issuance of these sewer bonds is particularly connected with the issuance of bonds for the construction of the electric plant, as it is claimed that the plaintiff failed to object to their issuance. The amount of such bonds, however, would not exceed the constitutional debt limit if we consider such issue separate and apart from the proposed issue of the light and power bonds, and, consequently, it would not have availed the plaintiff to object to the issuance of the sewer bonds upon the ground that the constitutional debt limit had been exceeded.

The present law (Gen. Mun. Law, art. 14-C) permits a city to issue bonds for new construction or enlargement of sewer systems. Concededly the present sewer system is owned and controlled by the city. Defendants claim that no revenue is derived from its operation, and that, therefore, no revenue from city-owned property is or can be appropriated to the sewer extension program. It is apparent from the testimony adduced that the city makes appropriation for the sewer fund and charges and collects sewer rentals. The sewer system is a city activity.

Section 20 of the General City Law grants to cities various specific powers. That section states that such powers are subject to the Constitution and the general laws. Subdivision 5 permits a city to become indebted for a municipal purpose and to issue therefor the obligations of the city. By a provision inserted in 1933, in effect April twenty-fourth, such power is limited by the following language: " But, notwithstanding the provisions of any general, special or local law or ordinance, a city shall have no power to issue obligations to which it has not pledged its faith and credit for the payment of the principal and interest thereof." The defendant city has issued bonds for the construction and enlargement of its sewer system to the extent of $187,000. It is its claim that such bonds are not to be counted in determining the constitutional debt limit. It relies upon the provisions of chapter 782 of the Laws of 1933, referred to as the Mandelbaum Act, together with article 14-A of the General Municipal Law and the provisions of the bonds themselves. The Mandelbaum Act declares that an emergency exists. It further provides that Congress, having enacted the National Industrial Recovery Act, making funds available for the construction of public works, all general, special or local laws which tend to hamper or delay municipalities from taking advantage of the act of Congress shall be inoperative. The National Industrial Recovery Act was passed June 16, 1933. Its primary purpose, so far as we are concerned here, was to relieve unemployment. Broad

powers were given the President and subordinates to make possible the objects of the law. Under that act and article 14-C of the General Municipal Law it is now claimed that other laws are superseded. It is urged that as the Mandelbaum Act still stands and as article 14-C extends the right of municipalities to issue revenue bonds for the objects permitted, therefore, there is no remedy to prevent the issuance of such municipal bonds without limit for a permitted purpose. I am convinced that the same rule should apply here to restrain cities from exceeding the constitutional debt limit, provided, of course, it is determined that such revenue bonds should be counted in determining such debt limit. So we have the question squarely presented as to whether these so-called revenue bonds should be so counted. The defendant city, as already indicated, has issued or authorized the issuance of $187,000 of these bonds. The proceeds of the sale are to be used for the purpose of improving and extending its sewerage system. These bonds contain several provisions which are pertinent here. They recite that the city, for value received, promises to pay them, but to pay them only from revenue to be derived from the project. The bonds recite that they are issued in compliance with the Constitution, with article 14-C of the General Municipal Law, the General City Law and the resolutions of the common council adopted June 11, 1937. By their terms they are secured by a pledge of the net revenue of the project and are a permanent lien on such revenue. The bonds state specifically that they are not a debt of the city and that the holder should not have the right to compel the taxing power of the city to pay them. The city agrees, however, that it will maintain and collect reasonable rentals so that the project will always be self-supporting and sufficient to pay the bonds and interest and all reasonable expense of operation and maintenance. Under section 404 of article 14-C of the General Municipal Law these bonds can only be sold to the government or an agency of the government. By section 408 it is provided that these bonds shall not be a debt of the city and shall be payable only from revenue derived from the operation of the undertaking. It also provides that these bonds may be issued without regard to any limitation or restriction on the amount of indebtedness or outstanding obligations. In other words, any limitation, constitutional or otherwise, may be disregarded. Under section 409 the provisions of section 7 of the General Municipal Law, providing for the payment of bonds from taxation, are not applicable, and no holder has the right to compel the taxing power of the city to pay them. Under the law it seems that if a surplus remains after paying expenses and the bonds and interest when due, such surplus may be transferred to the general city fund. Under these various provisions

it would seem that the city may have all the benefits to be derived from the issuance of the bonds without incurring any obligation for their payment except to assess the users of the sewer connections for such an amount for rental as would insure the city against obligation in the operation of its property.

In the case of *Robertson* v. *Zimmerman* (268 N. Y. 52) a sewer authority had been created by chapter 349 of the Laws of 1935 for the city of Buffalo, such authority to be appointed by the mayor subject to confirmation by the common council. This authority was given complete control and supervision of the sewer system. The act was to afford a means to carry out an order of the State Commissioner of Health. It granted to the sewer authority power to issue its bonds. A taxpayer's action against the city and the mayor was brought to restrain the appointment of members of the authority by the mayor. A motion was made by defendant to dismiss upon constitutional grounds. The motion was granted and was sustained. The court held that the act was constitutional; that the act did not provide for the issuance of bonds by the city, and it further held that the bonds of the authority did not increase the bonded indebtedness of the city as such bonds would not be a lien on the existing system or property to be acquired or any existing source of revenue.

In the instant case the city, in the resolutions authorizing the bonds, among other things, agrees that it will keep the system in good repair and make necessary repairs and replacements and will charge such rentals as will enable it to do so. The city further agrees that it will maintain insurance upon the undertaking and things of that kind, but such expenditures are to be made only from revenues of the undertaking. The resolutions further provide that if default be made in the payment of the bonds a receiver may be appointed to take possession of and operate the undertaking and apply the revenue as the city might do. The resolutions further provide that it is found, determined and declared that no sewer rents have been imposed or charges made for the use of the existing system and that the improvements contemplated and the issuance of the bonds do not involve the diversion of any existing source of city revenue. That declaration of an existing state of facts would not seem to be sufficient evidence of such existence if it is contrary to actualities, but, in the absence of evidence to that effect, it cannot be said that any source of revenue will be destroyed by the proposed plan.

In *Kelly* v. *Merry* (262 N. Y. 151) the trustees of a village entered into a conditional sales contract for the purchase of machinery for an electric lighting plant, which provided that the purchase price should be payable from the revenues of the system and to be evi-

denced by pledge orders. The ownership of the machinery was to remain in the vendors until final payment. The court held that this did not create a debt of the village as its credit was not pledged.

In *McCabe* v. *Gross* (274 N. Y. 39) bonds were to be issued by the board of education of the city of Troy. They were to be the obligation of the city school district and were not to be reckoned as an obligation of the city. The court held that they were a city obligation as they were to be paid from taxes raised by assessment on the same property. They were not revenue bonds.

In *Gaynor* v. *Marohn* (268 N. Y. 417) an action was brought under section 51 of the General Municipal Law to restrain the board of supervisors of Albany county from taking steps to carry out the provisions of a statute creating a light and power district. The act authorized the district to issue bonds to be paid out of revenue, and, if the revenue was not sufficient, to tax the property of the district. The court held that such bonds would not be an indebtedness of the county and, incidentally, that the debt limit for municipalities does not apply to assessments for benefits.

The above are illustrations of what has been decided by the courts regarding the authority of municipalities to issue bonds for public improvement, to be paid from revenue, and the liability of municipalities for such payment.

In the instant case these revenue bonds are to be taken only by the government. The rights of individual purchasers cannot be prejudiced. In the case of these revenue bonds it seems to me that the policy of the law in greatly extending the powers of municipalities by recent enactment is to be gathered from the law itself. The proposed grant of Federal aid and the furnishing of funds by bonds to be acquired by the government and to be paid from revenue only do not call for any expenditure of city funds. While it calls upon the city to perform various duties, the performance of those duties calls for no expenditure of funds to be realized from taxation. Under those circumstances it should not be said that the property of the city, even though it owns the sewer system, is appropriated to carry out the program. A method for the liquidation of the bonds is prescribed and that method only can be pursued.

To issue obligations and in the same breath disclaim liability for their payment may seem to partake of the nature of a subterfuge. The law, however, seems to permit it in the case of revenue bonds. Under the circumstances it should not be said that the law authorizing these revenue bonds is unconstitutional.

Even though these bonds are not to be counted in determining the constitutional debt limit, I feel that the defendants should be restrained and the injunction continued upon the present state of facts.